## Court of Appeals.

### December, 1904.

## THE PEOPLE v. GEORGE A. SMITH.*

### (180 N. Y. 125.)

1. MURDER—SUFFICIENCY OF EVIDENCE.

   The evidence upon the trial of an indictment for homicide reviewed and held sufficient to warrant a verdict convicting the defendant of the crime of murder in the first degree.

2. APPEAL—CONTROVERSY BETWEEN COUNSEL.

   An exception taken to the remarks of the prosecuting officer, made in the course of a dispute with defendant's counsel, presents no reversible error where the jury is instructed to the effect that the discussion was not material.

3. CHARGE—CIRCUMSTANTIAL EVIDENCE.

   An instruction to the jury in a capital case resting upon circumstantial evidence, to the effect that if from the " established facts " the jury is satisfied of defendant's guilt, its judgment rests upon as secure and reliable foundations as though it rested upon the testimony of eye witnesses, presents no reversible error.

4. SAME—RECITAL OF FACTS.

   Where a charge is full and fair, deals only with facts in evidence and submits the question of defendant's innocence or guilt to the jury, the narration of the facts constituting the defense in substantially defendant's own language does not make it erroneous for the trial court to bring them to the attention of the jury because his story seems unreasonable or incredible.

APPEAL from a judgment of the Supreme Court, rendered February 19, 1903, at a Trial Term for the county of Monroe upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

Louis E. Fuller, for appellant. It was prejudicial error on the part of the trial court to compel the defend-

---

*For previous conviction and reversal see People v. Smith, 172 N. Y. 210, 17 N. Y. Crim. 39.

ant's counsel to object to questions put by a juror calling for certain evidence, the admission of which on the former trial was one of the grounds of reversal by this court, which was well known to the trial court and the district attorney. And it was highly prejudicial for the district attorney, following this, to make an uncalled-for remark charging the defendant with the entire odium of rejecting the evidence, and, after the defendant's counsel had protested against the remark, to retort in language distinctly conveying to the jury the inference that he knew that Mrs. Smith had made statements connecting the defendant with the commission of the homicide, and demanding in hot words that everything she said from the time of the shooting until she died be admitted in evidence. (Klinker v. T. A. R. R. Co., 26 App. Div. 322; People v. Fielding, 158 N. Y. 542; Cosselman v. Dunfee, 172 N. Y. 507.) It was error on the part of the court to charge the jury that, if they found the defendant guilty, in drawing inferences from the " established facts " in the case, their judgment rested upon a foundation fully as secure and reliable as though it rested upon the testimony of eye-witnesses. (Chapman v. Erie Ry. Co., 55 N. Y. 579; People v. Levison, 16 Cal. 98; St. Louis, etc., Co. v. Vincent, 36 Ark. 451; Sherman v. Dutch, 16 Ill. 283; Strong v. State, 84 N. W. Rep. 410; Devereaux v. C. C. P. Co., 17 S. C. 72; Penn. R. Co. v. McTighe, 46 Penn. St. 316; Carlisle v. Hill, 16 Ala. 398; Dodge v. Brown, 22 Mich. 446; Greenfield v. People, 85 N. Y. 75.) The charge of the court concerning the nature and value of circumstantial evidence, taken as a whole, and in view of the fact that the evidence in this case was entirely circumstantial, was erroneous and prejudicial, for the reason that it greatly exaggerated the value and importance of circumstantial evidence, and strongly tended to influence the minds of the jury to attach an undue importance to the various circumstances testified to by the People's witness. (People v. O'Brien, 120 Cal. 1.) It was prejudicial error on the part of

the court to charge the jury that, if they believed that certain improbable and impossible things were done by masked burglars and by the defendant—the things referred to being sarcastically exaggerated and misstated by the court—then it was their duty to acquit the defendant; but if they reached the conclusion that burglars didn't shoot his wife, and that his statements were false, then they should determine whether he put on his trousers and socks of his own accord, and the purpose of putting them on at that hour of the night. (Blashfield on Instructions to Juries, section 29.)

Stephen J. Warren, district attorney (Willis A. Matson, of counsel), for respondent. The Trial Court did not compel the defendant's counsel to object to questions put to a witness by a juror, nor was the admission of such evidence at the former trial one of the grounds of reversal, nor was the defendant charged with the odium of keeping out the conversation asked for by the juror. The conversation which the juror attempted to bring out at this trial was not the subject of controversy upon the former appeal. The only declarations of the deceased passed upon by this court were those made by her five or six hours later to the witnesses Wright, Van Horn and Townsend. (People v. Smith, 172 N. Y. 211.) The charge was fair and impartial and was a correct statement of the law. (People v. Harris, 136 N. Y. 446; Stover v. People, 56 N. Y. 318; People v. Henze, 82 N. Y. 613; People v. Smith, 172 N. Y. 210; People v. Buchanan, 145 N. Y. 8; People v. Flanigan, 174 N. Y. 369; People v. Minnaugh, 131 N. Y. 563; Sindram v. People, 88 N. Y. 202; People v. Constantino, 153 N. Y. 34; Winnie v. McDonald, 39 N. Y. 239; Massoth v. D. & H. C. Co., 64 N. Y. 524; Hoffman v. N. Y. C. & H. R. R. Co., 87 N. Y. 32; People v. Osmond, 138 N. Y. 85; People v. McCallum, 103 N. Y. 597.)

O'BRIEN, J.: The defendant has been convicted of the crime of murder in the first degree upon an indictment which charged

him with the killing of his wife about three o'clock on the morning of September 9th, 1897. The woman died about five days thereafter. That her death was caused by a pistol shot wound in the head inflicted feloniously while she was in bed, either by the defendant or some other person, is not disputed. The evidence in support of the indictment against the defendant was mainly circumstantial and consisted largely of the defendant's acts, conduct and statements concerning the tragedy. The case comes before this court for the second time. On a former appeal we reversed the judgment of conviction for certain erroneous rulings at the trial in the admission of evidence which was held to be incompetent. (People v. Smith, 172 N. Y. 210, 17 N. Y. Crim. 39.) The new trial then granted has resulted in another conviction, and the present record is free from the objections found in the former one.

The facts and circumstances of the case are so fully stated in the report of the case on the first appeal that it is quite unnecessary to repeat them here at any great length, and they will be referred to as there stated, but only in a very general way. There is very little difference in the facts as they now appear and as they were disclosed by the former record. The defendant professed to know, and doubtless does know, in what manner and under what circumstances his wife was killed. A few hours after the tragedy occurred he stated with considerable detail all the facts as he claimed in regard to the homicide, and these statements, which the proof at the trial tended to show were utterly false, constitutes a large part of the groundwork of the case against him, and which has resulted in producing two convictions. The homicide was committed in the house where the defendant and his wife lived and the only other occupants were an invalid nephew of the wife and a young woman who attended him as a nurse. The nephew and the nurse occupied a bedroom and hall directly over the room where the defendant and his wife slept, but they heard no shot, although the nurse was giving

medicine on the hour and between hours passed up and down stairs. The defendant and his wife occupied the same bed, having retired about 10 o'clock on the previous night. Shortly before three o'clock in the morning a physician, who was a near neighbor, heard the report of a pistol in the direction of the defendant's house, but, so far as appears, it was heard by no one else. At about three o'clock the nurse was aroused, but what awakened her she was unable to state. Upon awakening she heard groaning, went to her patient, found him sleeping and then concluded that it was below and that it was the defendant. She did not go to the room where he was until about four o'clock and in the meantime the groaning continued, but she heard no other sound except sometime after three o'clock she heard the shutting of a door which she was not able to locate. When finally she went below she found the defendant in the dining room fastened with cords or small ropes to the leg of the oak dining table, with his legs bound, his hands tied behind him and a gag in his mouth. She asked him if he was sick and he replied, " They bound me, let me loose." She at once summoned the neighbors. Upon her return she went to the bedroom occupied by the defendant and his wife, saw blood on the decedent's face and on the sheets and asked her what had happened. She did not reply, but inquired for the defendant. The neighbors soon reached the house. One of them cut the cords with which the defendant was bound and raised him from the floor, when he at once stated that two masked burglars had entered the room occupied by himself and wife, dragged him from the bed, compelled him to disclose where his money was hidden, which they took, and then bound, gagged and left him in the condition in which he was found. He was partly dressed, having on trousers, a night shirt, a pair of socks, and suspenders over his shoulders. The table to which he was fastened was an ordinary dining table, upon which were the dishes ordinarily used for meals. He described the burglars as one being tall, the other

short, as wearing white masks and moccasins and as carrying shining revolvers. He also stated that they kicked, pounded and sandbagged him; that he heard the discharge of a gun in the room then occupied by his wife, who cried "Murder," and that was why they shot her; that after the gun went off the burglars said it went off accidentally. This is substantially the defendant's version of the tragedy which resulted in the death of his wife.

The premises where the homicide occurred were searched by officers who found pieces of rope or cord which were proved to be similar to those with which the defendant was bound. A revolver frame without a cylinder and also the center pin were found in a building upon the premises, and in the same building were found several cartridges, the bullets in which were proved to be similar to that extracted from the decedent's head. The cylinder belonging to the revolver frame was never discovered, although a most thorough search was made of the entire locality. The defendant groaned and complained so loudly of pain resulting from his injuries that he was asked to keep quiet both by the physician and nurse in attendance. Subsequently the physicians removed his shirt, examined his chest, abdomen and hip where he claimed to have been injured, but no indications of external bruises or injuries were found. Proof was given that there was dust on the window sill that appeared to be undisturbed, which tended to show that no one passed through the window by which the defendant claimed that at least one of the burglars had escaped. There was also proof that where he said the box containing his money was hidden there was dust, but that it was undisturbed, thus indicating that his statements in that respect were also untrue. The testimony at the trial tended to show that these statements of the defendant were false. There was some evidence tending to show that the relations between the defendant and his wife had at times been unpleasant, although there was other evidence that their relations were most

friendly. There were two life insurance policies of one thousand dollars each upon the life of the decedent which had been assigned to the defendant.

The jury have evidently found that the defendant's statements in regard to the homicide were false, and if they were false, as declared by the verdict, that is a circumstance of far-reaching importance, since it is quite inconceivable that such a series of falsehoods would be constructed by the defendant except for the purpose of warding off suspicion from himself. Such a series of falsehoods could not have originated in the defendant's mind unless through a consciousness of his own guilt. So that the truth or falsity of these statements was a matter of importance at the trial, and when the jury found that they were false, the conclusion that the defendant himself was the author of his wife's death was almost inevitable.

This case comes before us again, as it did on the former appeal, without any claim on the part of the defendant's counsel that the case should have been taken from the jury, and manifestly there can be no ground for such a claim. The question of the defendant's guilt or innocence under the circumstances was for the jury and we cannot see how any other verdict than the one rendered was reasonably possible under the circumstances of the case. What was said by the court in disposing of the former appeal is just as applicable to the case now as it was then, and hence we may now assume many things that were the subject of discussion before. There was a mass of expert evidence produced to show that the revolver found in the building without a cylinder was the weapon from which the fatal shot was fired and that the bullets found with this revolver frame corresponded with the bullet taken from the head of the deceased woman. It is quite unnecessary to go into these matters again. It would only be repeating what has been said before.

The learned counsel for the defendant seeks to reverse this judgment upon certain exceptions which were taken at the trial

to the admission or exclusion of evidence, to the conduct of the trial generally and to certain parts of the charge. These exceptions are very numerous, and they have been discussed at the bar and in the briefs of counsel at very great length. It would serve no useful purpose to discuss or refer to them in detail, and it would extend the scope of this opinion beyond all reasonable limits. It is enough to say that we have carefully examined them all and we think that none of them present any question that would justify this court in interfering with the verdict.

There are two or three exceptions in the case that have been presented at length, and with great earnestness. If these exceptions present no error, it is safe enough to say that the rest are very much weaker and even less harmful.

After a witness called by the People had been examined by both sides and his examination completed, a juror interrogated the witness with respect to whether any one asked the deceased any question when they were probing the wounds. The witness answered "yes." The juror then asked what they asked her. When the last question was propounded by the juror as to what they asked, defendant's counsel interrupted the answer by remarking that he did not object to it "except the Court of Appeals had ruled it should not be presented in this case." The district attorney then said: "There is no objection, unless there is an objection made coming from the defendant." Whereupon the court remarked: "It is hardly proper to ask those questions." Counsel for the defendant then took up the discussion and, among other things, stated that he considered it an exceedingly improper thing, when he had made an objection for the purpose of having the case tried as the Court of Appeals had indicated with respect to this evidence, "that an attempt should be made by counsel to prejudice the defendant by flinging it at me that the door had been opened and this truck that went in the last time should be admitted in the case, for the reason that the only effect of that thing can be to give to this jury an inference

of something from which they may draw an inference that something was said by Mrs. Smith to some of these people from the time she was found there until she died, charging this defendant with having some connection with that crime. Now I consider that an exceedingly improper thing to do here at this trial, for the reason that my friend himself knows that not a word was uttered by that woman charging this defendant with the commission of that crime, or any connection with it, and it seems to me flinging out an innuendo of that kind on the part of the counsel is wrong and prejudicial to the defendant, and it should be stopped." The district attorney then said: " The counsel has made the declaration that he intended to make when he started in, and that declaration is to the effect that I know that Mrs. Smith said nothing in regard to this defendant having any connection with the commission of the crime that night. I say in return that I do not know that to be the fact, and if that is the position the counsel is to take in this case I say let all the conversation that was had with Mrs. Smith on that night come into this case. So I say, if there is no objection on the part of the counsel for the defendant, let this testimony come in. The inquiry has been made as to what was said there, and I have not any objection to it. Let everything come in. I say let it all come in, all she said from the time of the shooting until she died." The court then said in the presence of the jury: " Gentlemen, you will disregard and not consider the remarks just made by counsel upon either side." Defendant's counsel excepted to the remarks made by the district attorney, and the latter stated they were only made in reply to what defendant's counsel had said. The discussion was then dropped.

It will be seen that the matter quoted above from the record presents no question of law or even of fact. So far as there was any expression of opinion of the court it was in favor of the defendant and not against him. It frequently happens in a long and tedious trial, such as this was, that counsel are tempted to

indulge in verbal disputes in which each acts a part intended to make an impression on the jury.   It is very seldom, if ever, that this kind of verbal warfare produces the result intended or has any effect whatever except to ruffle the temper of the combatants. The persons selected as jurors in a capital case ought to be credited with such a measure of sturdy good sense and judgment that no danger of injustice to the accused need be seriously entertained by reason of such incidents at the trial.   If it were otherwise, and it could be supposed that a jury selected to try a case involving the question of life or death could be influenced by such unbecoming displays of professional zeal, it would go far to discredit the whole jury system.   This court cannot reverse a judgment even in a capital case by reason of a dialogue between counsel which originated with the defendant's counsel himself, and in which he had if not the last, possibly, the strongest word, especially when the court put the matter at rest by a ruling in the presence of the jury to the effect that the discussion had nothing to do with the case.

The court charged the jury that "no greater degree of certainty is required where the evidence is circumstantial than where it is direct, for in either case the jury must be convinced of the prisoner's guilt beyond a reasonable doubt.   You are bound by your oath to render a verdict upon all of the evidence, and the laws make no distinction between direct evidence of a fact and evidence of circumstances from which the existence of a fact may be inferred.   In drawing conclusions and inferences from the established facts in this case, if you reach the conclusion that the accused was guilty of the crime charged against him, your judgment rests upon a foundation fully as secure and reliable as though it rested upon the testimony of eye witnesses." This part of the charge was excepted to, and it is claimed that prejudicial error is to be found in the language quoted and the use of the words " established facts " because they are the positive assertion of the sufficiency of the People's case and the in-

struction eliminated the question of reasonable doubt. The use of the words "established facts" doubtless had reference to certain facts in the case which were not disputed, but it is apparent from the whole charge that there was no intention to take from the jury any question of fact as established beyond their power to determine what the real truth was with respect to the whole case.* The central idea which the trial court was evidently attempting to impress upon the minds of the jurors was that the evidence of eye witnesses of the killing was not necessary, but that their verdict might rest upon circumstantial evidence, provided they were satisfied of the prisoner's guilt beyond a reasonable doubt. In this there was no error.

There is another paragraph of the charge that is earnestly assailed by the defendant's counsel, and the exception covering it is perhaps the most important one in the case. The charge was as follows: "If you believe from the evidence that masked burglars entered the bedroom occupied by the defendant and his wife, dragged him from his bed into the dining-room and allowed him to put on his trousers and socks because he was cold, sandbagged and pounded him and he made no outcry, compelled him, by holding shining revolvers to his head, to disclose where his money was hidden, which they took from under the bureau without disturbing the dust which covered the floor where this cigar box was located, and then bound and gagged him and tied him to the leg of the dining table, upon which there were dishes apparently undisturbed, and then because his wife made an outcry they shot her and then the burglars left the house, one or both of them going through the window upon which there was mosquito netting, without tearing the netting from the window or disturbing the dust on the window sill or the grass under the

---

*Other cases in which like doctrines are stated are: People v. Cannon, 139 N. Y. 645, 10 N. Y. Crim. 541; People v. Tuczkewitz, 149 N. Y. 240, 12 N. Y. Crim. 49, 57; People v. Moore, 26 Misc. 168, 14 N. Y. Crim. 60, and People v. Flanigan, 174 N. Y. 356, 17 N. Y. Crim. 300, 316.

window, then, gentlemen, it is your duty to acquit him.   But if you reach the conclusion that burglars did not enter the house that night and shoot his wife, and that his statements were false, then you may determine from all the facts and circumstances whether the defendant of his own accord put his trousers and socks on, and the purpose of putting them on at that hour of the night."   An exception was taken to this part of the charge, and it is insisted in behalf of the defendant that, taken as a whole, it was neither an exposition of the law nor a  fair summary of the evidence.   A careful perusal of the evidence of the witnesses on the subjects reviewed by the learned trial court in this portion of his charge discloses that all the facts collated were testified to repeatedly in the course of the trial and were substantially undisputed so far as they constituted the theory of the defense.   It was the story of the crime as narrated by the defendant to the witnesses who first discovered him tied to the leg of the dining-room table.   Several witnesses also testified to the location of the table, the window, the contents of the table, the condition of the window sill, the netting at the window where he had stated the burglars left the room and the other facts referred to in the charge.

This part of the charge is an epitome of the defendant's own version of the transactions that resulted in the death of his wife. It contains no element that was not to be found in the evidence at the trial.   It is said that the learned trial judge to arranged and marshalled the facts disclosed by the testimony that a vein of sarcasm runs through the whole passage, which was not only out of place, but unseemly and erroneous in the discussion of such grave questions as the case presented.   We do not think that this criticism is well founded.   If the narrative of the facts in substantially the defendant's own language made a story that seemed unreasonable or incredible, it was not on that account error for the trial court to bring them to the attention of the jury.   Whatever the impression that the narrative, as it appears

in the charge, is calculated to make on the mind is due to the character of the facts themselves as stated by the defendant, rather than to any coloring or rhetorical art on the part of the learned trial court. It would be quite difficult to so arrange the facts in the defendant's narrative of the events that resulted in his wife's death without giving the impression of which the learned counsel for the defendant now complains. It is the defendant's own version of the transactions that impresses the mind and not the manner in which it is stated. The charge, on the whole, was a fair one, and if there were expressions in it that indicated that the judge had an opinion upon the questions of fact, he was careful to guard the jury from any possible influence from that source. The following passage from the charge will show how completely the jury was left to determine the case for themselves: " Now, gentlemen," said the court, " if you have gleaned any information as to my views of the merits of this case by any of my rulings or remarks made to counsel during the trial, you will discard it at once. . . . But whether the defendant killed his wife is a question of fact which you must determine from all the evidence in the case, and that must be established beyond a reasonable doubt. . . . If you are satisfied from the evidence that the defendant committed the crime of killing his wife . . . These are questions for you to consider and answer. I do not say he did the things, or what inference may be drawn from the facts proved. I simply allude to these important points in order that you may give them your careful consideration. If burglars did not commit the act, then it is for you to say from all the facts and circumstances whether the defendant committed the crime or not." We do not think that any fair reason can be given for disturbing the judgment in this case based upon the charge or upon any ruling disclosed by the record. It should be observed that no trace of any burglars was ever found in the neighborhood and the theory of the People was that the defendant committed the homicide himself and

then invented the story that it was the act of burglars in order to protect himself from suspicion. The proof also tended to show that the binding and gagging was done in such a way that he could easily have accomplished it himself. It is now over seven years since the offense was committed of which the defendant has been convicted. There have been substantially three trials of the case. The first trial resulted in the discharge of the jury without a verdict in consequence of the serious illness of one of its members. The second trial resulted, as already stated, in a verdict of guilty. The judgment upon that verdict was reversed in this court for the reason stated. On the new trial thus ordered the defendant has been convicted again, and after a careful review of the whole case, we have been unable to find anything in the record of the trial that would justify this court in interfering with the judgment, and so it must be affirmed.

CULLEN, Ch. J., GRAY, HAIGHT and WERNER, JJ, concur; BARTLETT and VANN, JJ., dissent.

Judgment of conviction affirmed.